Freedman, J. (concurring).
The claim made in this case by and on behalf of the elevated railway companies is that the absolute fee of the street known as the Bowery was, prior to the surrender of the Dutch forces to the English, in 1664, in the Dutch government; that such fee thereafter went to the state or to the city of New York so absolutely that abutting owners never had, and do not now have, any easement of any kind in said street; and that the elevated railway running through the Bowery having been constructed with the consent of both the city and the state, neither its owners nor its lessees are liable for any injury inflicted upon abutting property by reason of the construction and operation of the railway.
The claim of the English that they were the owners, by right of discovery under governmental authority, of the land of which the present city of New York forms a part, and that this gave them such exclusive ownership that the Dutch government *272 acquired no title to the land which can be recognized, has been fully set forth in the opinion of Judge Truax. I concur in his remarks as far as they go, but wish to add the following, viz:
The claim of the English, it is true, has occasionally been criticised on the ground that neither of the Cabots landed in or near New York, or saw the coast of New York. The right of discovery is not recognized in the Roman law unless followed by occupation or unless the intention of the sovereign or state to take possession be declared or made known to the world. And it must be conceded that modern diplomatists and publicists incline to the opinion that mere transient discovery amounts to nothing, unless followed in a reasonable time by occupation and settlement, more or less permanent, under the sanction of the state.
But the question in the case at bar is not to be decided according to the rules of the international law of the present time. It is a question purely between the public authorities of the state of New York and citizens- of the same state, and as such it is controlled by the decisions referred to by Judge Truax to the effect that what the English did do was sufficient to give them title by discovery, and that such title is superior to the Indian title. These decisions proceeded upon the theory that the claim of the Dutch was contested by the English from the very start, not because they questioned the title given by discovery, but because they insisted on being themselves the rightful claimants under that title, and that the claim of the English was finally decided in their favor by the sword.
That being so, it follows, that in contemplation of present law, neither the Dutch nor the Roman law ever prevailed in the state of New York, de jure, and that the common law of England must be deemed to be the original source of all our law. And it *273 further follows that the foundations of the rights of owners of land abutting on a street laid out while the Dutch were ih possession, as against the city or the state of New York, rest upon the English common law, and that they are not to be affected by the Dutch or Roman law.
Reported cases • in which the validity of Dutch grants was upheld between individuals, have no application to the present controversy.
Now under the English common law the presumption is that the owners of lands lying on a highway are the owners of the fee of the highway; that the owners on each side of the highway own the soil of the highway in fee to the centre of the highway, and that the rights of the public in and to the highway are no higher or other than those of a mere easement. Wager v. Troy Union R. R., 25 N. Y. 529. This presumption applies as well to the streets of a city as to a country highway. Bissell v. N. Y. Central R. R. Co., 23 N. Y. 61. This presumption of law is founded on the supposition that the way was originally granted by the adjoining owners in equal proportions. Watrous v. Southworth, 5 Conn. 305. But the presumption may be rebutted by proof to the contrary, and it is rebutted by the production of a deed under which the owner derives title, granting the land to the side of the street only.
Under the operation of this rule, and there being no proof of alienation or escheat requiring a different conclusion, it must be assumed in this case that the original grantors from whom plaintiffs’ title has been derived, owned the soil of the Bowery in front of the premises in suit to the centre of the street.
But even if the title of the English rested not in discovery, but in conquest, and the English, upon the surrender by the Dutch in 1664, acquired from the Dutch a title to the then existing streets as ab *274 solute as under the Roman law the title of the government to a military highway was, the fact would not improve the position of the defendants. Upon receiving such title the English could do with ‘it what they pleased. They were not bound to enforce it against abutting owners as the Dutch government might have enforced it. The presumption is that they took the title and the streets to be held by them according to their own laws, and as matter of fact, they thereafter so dealt with said streets as to admit of no other conclusion.
The province having been granted by Charles II. to his brother, the Duke of York, by the charter of 1664, several months before the surrender to Sir Richard Nichols, the grant, in order to remove all doubt as to its validity, was afterwards confirmed by the charter of 1674, also granted to the Duke of York. The object of both charters was to enable the Duke of York to plant a colony on this continent. The charter of 1664, issued under the great seal of England, contained a provision that the statutes, ordinances, &c., to be established by the Duke in the new country should “not be contrary to, but as nearly as might be agreeable to the laws, statutes and government of the realm of England.” This charter was, therefore, in itself an explicit declaration of the King’s will that the laws of England • should be established in the colony and that' the laws of the Dutch settlers should not be retained. The consequence was that, having obtained the lands, the English held them, not under the Dutch or the civil law, but under the common law of their own country. English law governed English land, so that, even if an absolute title to a street was obtained, the street was ever thereafter treated as an English street under the common law. If, therefore, the crown, or, subsequently, the state or the city of New York at any time owned both the land in the *275 street and the land adjoining, and thereupon granted a piece of land bounded on the street as a street, by a proper description, such a grant, under the principles of the common law, carried title to the centre of the street. And if the piece of land was bounded not on the street generally, but by the side of the street, the grantee acquired an easement in the street as regards light, air and access, and no express grant or covenant for that purpose was necessary.
As matter of fact the Duke of York ascended the throne of Great Britain as James II., in 1685, and the fee to the streets now in question remained in the British crown until 1686, when it passed from the crown by the Dongan charter. By that charter there was granted to the city of New York, “ all and every the streets, lanes, highways, and alleys within the city of New York and Manhattan Island aforesaid for the public use and service of the mayor, aldermen and commonalty of the said city and of the inhabitants of Manhattan’s Island aforesaid and travellers there.”
This grant was confirmed by the Montgomerie charter of 1730 and by various colonial laws.
Upon the organization of the state of New York, the said state, in its corporate and sovereign capacity, succeeded to all the rights of the crown in and to all the land within its territorial limits.
By the act of October 22, 1779 (1 Greenleaf, p. 31, § 14), all the property in all lands and all the rights, titles, privileges and royalties, which belonged to the British crown on or before July 9th, 1776, were declared to be vested in the people of the state. And, by the Act of March 7, 1793, §§ 3 and 111, re-enacted on April 9, 1813 (Laws 1813, ch. 86, § 192), the state transferred to the city all its estate, right, title, interest, claim and demand in and to all lands “ theretofore left for streets or highways ” in the city of New York “ for the use of streets and highways.”
*276 Thus it will be seen that, although the city acquired a double title, from the crown and the state, to these old streets, the title is not absolute, but “ for the public use and service of the mayor, aider-men and commonalty of the said city and of the inhabitants of Manhattan’s Island aforesaid and travellers there,” and “ for the use of streets and highways.”
The words “ for the public use * * * of the inhabitants of Manhattan’s Island and of travellers there,” are quite significant. They contemplate use by two different classes of persons. The right of use by a traveller consists in the right to pass over and through the streets. The right of use to be enjoyed by the inhabitants consists in the right to use a street for all purposes for which a public street can properly be used, and one of those rights is the right to build upon and along side of the street and to have light and air and access from the street. These different uses can be harmonized and they have always been recognized by the legislature of the state and by the corporation of the-city of New York. As matter of fact, all the streets in the city of New York always existed as much for .the benefit of the occupants of the houses built along the sides of the streets as for the benefit of the general public, and new streets were opened and constructed from time to time according to the demands of building necessities. Building always preceded travel. If the upper parts of the city had not been built up so rapidly that the means of communication with the lower parts became insufficient, there would have been no demand for rapid transit and the elevated railways would not have come into existence. But there never was at any time any necessity in the city of New York for a military road or highway as known to the Roman law. The streets of the city grew as commercial requirements dictated.
*277 On each side of every street now existing there is a sidewalk for the passage of pedestrians, and between the sidewalks there is a carriage way for the passage of vehicles. The width of each street is fixed bylaw, and the common council of the city always had the power, subject to certain limitations, to regulate by ordinance the use of the streets and of the sidewalks. In the exercise of this power the common council, by ordinances which have repeatedly been recognized by the Legislature, allowed on each sidewalk a so-called stoop line, and within such stoop-line, stoops, areas and steps descending into the cellar or basement were constructed by the owners of the adjacent houses. Under another ordinance many abutting owners purchased from the city the right to build vaults under the sidewalks of their respective premises and built vaults upon the faith of such purchases, and many of these vaults have become very valuable. Sewers were constructed through the streets and all houses along the lines of the street were connected with such sewers, and the owners of the houses were assessed for the cost of the sewers, on the theory that their property had been benefited by the construction. So, when the streets were paved, the expense was in like manner assessed upon the abutting property. Moreover, water, gas, steam and electric light are now supplied to houses through pipes running through the streets. These matters sufficiently show the uniform and settled policy of the city and the state with respect to houses built upon and along the lines of the streets. No discrimination was ever made by reason of the fact that a certain street was an old Dutch street.
How, then, can it be successfully claimed at the present time that in any street which once was a Dutch street, the city of New York or the state, or both together, may rightfully, and without making *278 any compensation whatever, cnt off all projections from the house lines into the street, deprive the houses built upon and along both sides of the street of all benefits derived from the street, and then, if they see fit, build a solid wall against the houseline on each side of the street sufficient to shut up the occupants completely in their respective houses. This is precisely what the claim of the elevated railway companies amounts to, although milder language has been used in its presentation. The bare statement of the claim demonstrates its absurdity.
It should also be observed that the defendants have failed to show that the dimensions and the location of the road known as the Bowery during the Dutch' occupation, were identical with the dimensions and the location of the Bowery of the present time. ' According to the proof the width of the Dutch roads in New York was about three Dutch rods, whereas the present Bowery is much wider. For all that appears the latter may have been laid out under English law.
From what has already been said it sufficiently appears that the rights of the plaintiffs to the use and enjoyment of the Bowery are in no way or manner affected by the question whether that street was laid out by the Dutch or the English. That being so is just as immaterial in this case as it was held to be in the Story case, whether the present plaintiffs own the fee to the centre of the street, subject to the use of the public, or whether the fee of the bed of the street is in the city of New York in trust for the purposes of a street, and the plaintiffs have only an easement in the street as regards light, air and access, for in either case the measure of damages is the same. If, therefore, the plaintiffs are considered as having only an easement, the case is still controlled by the adjudications already had to the effect that such an easement is private property, *279 and that such property can not be taken or impaired, even for a public purpose without compensation.
The exceptions relating to questions of evidence, the charge and the refusals to charge, have all been duly considered, and I concur with Judge Truax that none of them discloses any ground for reversal.
The judgment and order should be affirmed with costs.